**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2189
_____

ALISON GEORGE,
                                Appellant

v.

RUSHMORE SERVICE CENTER, LLC;
MILES K. BEACOM; DALE DOBBERPUHL;
THOMAS D. SANFORD; JOHN DOES 1 to 10


_____


On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-18-cv-13698)
District Judge: Honorable William J. Martini
_____


Argued on May 2, 2024

Before: KRAUSE, CHUNG, and RENDELL, *Circuit Judges*

(Opinion filed: August 13, 2024)

Yongmoon Kim
Philip D. Stern        **[ARGUED]**
Kim Law Firm
411 Hackensack Avenue
Suite 701
Hackensack, NJ 07601

*Counsel for Appellant*

Daniel McKenna      **[ARGUED]**
Ballard Spahr
1735 Market Street
51st Floor
Philadelphia, PA 19103

William P. Reiley
Ballard Spahr
700 E Gate Drive
Suite 330
Mount Laurel, NJ 08054

*Counsel for Appellees*

_____

OPINION OF THE COURT
_____


KRAUSE, *Circuit Judge*.

For almost six years now, Appellant Alison George has been seeking to represent a class and obtain damages from

2

Rushmore Service Center, LLC,[1] based on a letter naming the collection arm of George's credit card company, rather than the credit card company itself, as the "current/original creditor." App. 36 (capitalization altered). As alleged in the operative complaint, that phrasing violated the Fair Debt Collection Practices Act (FDCPA) by failing to identify "the creditor to whom the debt [was] owed" and providing "false, deceptive, or misleading" information. 15 U.S.C. §§ 1692e, 1692g(a)(2). And as alleged by way of injury, these violations would have left "the least sophisticated consumer" confused about "to whom the alleged debt [was] owed and if it [was] legitimate." App. 28. After the District Court granted Rushmore's motion to stay proceedings and compel individual arbitration, George lost before the arbitrator, who ruled in Rushmore's favor, and before the District Judge, who declined to vacate the arbitration award. On appeal, George challenges the merits of those rulings.

As it turns out, however, the main question on appeal is not related to the merits. Instead, it is whether these many years of litigation have been much ado about nothing. For while George's suit was proceeding, we issued two opinions— *Kelly v. RealPage Inc.*, 47 F.4th 202 (3d Cir. 2022), and *Huber v. Simon's Agency, Inc.*, 84 F.4th 132 (3d Cir. 2023)[2]— calling into question whether confusion alone is sufficient to allege a concrete injury in this context. Because we conclude

---

[1] Where relevant, we use "Rushmore" to refer to both Rushmore and the Rushmore officers named in the amended complaint.

[2] Both *Kelly* and *Huber* have "full retroactive effect in all cases still open on direct review." *Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 97 (1993).

that George lacked standing from the very outset, we must vacate the District Court's orders and remand with instructions to dismiss George's case. But as it may be that the arbitration award "can be enforced in a jurisdictionally correct proceeding," *Brown v. Francis*, 75 F.3d 860, 868 (3d Cir. 1996), we will decline to vacate the award itself at this juncture.

## I.    **Background**

### A.    The Rushmore Letter

In 2013, Alison George opened a credit card account with First Premier Bank. Under that account's contract, which became binding on George shortly after her enrollment, George agreed to resolve all account-related claims via individual arbitration. The arbitration provision covered George, First Premier, First Premier's "employees, parents, subsidiaries, affiliates, beneficiaries, agents and assigns," and the "employees, parents, subsidiaries, affiliates, beneficiaries, agents and assigns" of those entities. App. 109.

A few months after First Premier issued George's credit card, George defaulted on her account by failing to make the minimum required payment. This failure to pay triggered First Premier's collection apparatus, run through servicing entity Premier Bankcard, LLC. Notably, Premier Bankcard does not perform all of its own collection work. Instead, it outsources some of that work to corporations like Rushmore. A 2011 contract between Premier Bankcard and Rushmore, for example, obligated Rushmore to "undertake the collection of such . . . [First Premier] accounts as [Premier Bankcard chose]

4

to place with [Rushmore] for the purpose of collection."[3] *Id.* at 79.

In the 2011 contract, Rushmore agreed to contact its First Premier accounts "through collection letters as well as consistent direct telephone contact to maximize recovery." *Id.* Consistent with this commitment, and with Premier Bankcard's apparent assignment of George's account to Rushmore, Rushmore sent George a collection letter in April 2018. That letter, which was Rushmore's first communication to George, contained the following header: "Current/Original Creditor: PREMIER Bankcard, LLC." *Id.* at 36.

### B.     The Instant Suit

In the amended complaint, the operative complaint in this case,[4] George alleged that Rushmore's April 2018 letter was (1) "confusing as to whether" Premier Bankcard was the current or original creditor, and (2) misleading in any event, because First Premier, not Premier Bankcard, was "the current creditor to whom the debt [was] owed" and the "original creditor" of the account. *Id.* at 28. On that basis, George

---

[3] In exchange, Rushmore would receive a commission based on the amount collected.

[4] Around the same time George received her letter, another First Premier customer, Josephine Tailor, received a similar letter from Rushmore. Tailor filed a class-action complaint against Rushmore in the District of New Jersey in September 2018, and the amended complaint (filed two months later) added George as a plaintiff. The District Court dismissed Tailor's claims with prejudice when she passed away in August 2019, leaving George as the only putative class representative.

claimed—on behalf of herself and a putative class of those who received similar letters—that the letter violated the FDCPA. Specifically, George claimed that the letter failed to identify "the name of the creditor to whom the debt [was] owed" as required by law, 15 U.S.C. § 1692g(a)(2); that it constituted a "false, deceptive, or misleading representation . . . in connection with the collection of [a] debt," *id.* § 1692e; and that it used "unfair or unconscionable means to collect or attempt to collect [a] debt," *id.* § 1692f.

As to George's individual injury, however, the complaint was oddly silent. It alleged that George "received and reviewed the [April 2018] letter," App. 28, but it did not allege any consequences for George as a result of that receipt and review. And even as the complaint alleged that the letter was "confusing" and would "leave the least sophisticated consumer in doubt about to whom the alleged debt is owed and if it is legitimate," *id.*, it omitted any allegation that George *herself* was confused.

In May 2020, after limited discovery regarding arbitrability, the District Court granted Rushmore's motion to compel arbitration and stay proceedings under sections 3 and 4 of the Federal Arbitration Act (FAA), 9 U.S.C. §§ 3–4.[5] Rejecting George's arguments to the contrary, the Court held that (1) Rushmore could enforce the arbitration provision because it was Premier Bankcard's agent, Premier Bankcard

---

[5] At that point, the Supreme Court had not yet issued its seminal decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021). Neither party challenged standing before the District Court, and the District Court declined to consider it sua sponte.

6

being a First Premier affiliate, and (2) the arbitration provision covered George's FDCPA claims, which "unquestionably" related to her credit card account. *George v. Rushmore Serv. Ctr., LLC*, No. 18-cv-13698, 2020 WL 2319293, at *2–3 (D.N.J. May 11, 2020). The Court therefore ordered George to "submit her claim[s] to [individual] arbitration or notify the Court of her intention not to do so" within 60 days. App. 3.

### C.    Arbitration Proceedings

Rather than notifying the Court of her intent not to arbitrate, George filed an arbitration demand against Rushmore with the American Arbitration Association (AAA).[6] The parties engaged in "extensive discovery," Answering Br. 8, and in June 2022, the arbitrator rejected George's attempt to relitigate arbitrability and ordered a hearing to resolve the FDCPA claims on the merits.[7] At that hearing, which took place in October 2022, the arbitrator "heard testimony from three witnesses, received twenty-two exhibits, and heard oral argument" on contested legal issues over the course of five hours. *Id.* at 9. The parties later filed post-hearing submissions.

---

[6] George initially filed a timely arbitration demand with JAMS, but she refiled with the AAA after Rushmore objected. After a dismissal without prejudice (followed by refiling) and a stay, arbitration proceedings began in earnest in January 2022.

[7] The arbitrator, in effect, denied summary judgment, finding genuine issues of material fact as to whether Premier Bankcard was also a creditor and whether "the formatting of original/current creditor was misleading." App. 102.

The arbitrator issued his "final and binding" decision in November 2022. App. 112. In that decision, which awarded George $0, the arbitrator found that Rushmore was not liable for two reasons. First, by George's own admission, she never read the April 2018 letter: She stated during the hearing that "she did not read the Rushmore [letter] and, in fact, was essentially not reading debt collection letters generally, but rather passing them on to her attorney." *Id.* at 106. Even if the letter was misleading, the arbitrator reasoned, George herself "could not have actually been misled." *Id.* (emphasis omitted). Second, the letter itself was not misleading: Because Premier Bankcard serviced George's account and "received and was entitled to part of the funds from payments made by [George] on [that] account," it was at least a current creditor, and could therefore be listed as a "current/original, meaning current or original," creditor. *Id.* at 107. On the whole, the arbitrator concluded, George did not meet her "affirmative burden of proof to show . . . violations of the FDCPA." *Id.* at 106.

## D.    The Motion to Vacate

George returned to the District Court shortly after the arbitrator issued his decision, asking the Court to vacate the arbitration award pursuant to 9 U.S.C. § 10. In her motion to vacate, George challenged arbitrability for a third time, arguing that Rushmore was not a Premier Bankcard agent and therefore could not enforce the arbitration provision. She also argued that the arbitrator "failed to consider the relevant evidence," "manifestly disregard[ed] the controlling law," and, based on these factors, "exhibited evident bias" toward Rushmore. Suppl. App. 127.

8

The District Court once again disagreed.  In its opinion and order of May 2023, the Court (1) declined to reconsider its prior arbitrability ruling, and (2) found that the arbitrator "properly considered the evidence before him" and properly applied the law.  *George v. Rushmore Serv. Ctr., LLC*, No. 18-cv-13698, 2023 WL 3735977, at *2–3 (D.N.J. May 30, 2023).  The Court accordingly denied George's motion to vacate.[8]  *Id.* at *4.

George timely appealed both the May 2020 order compelling arbitration and the May 2023 order declining to vacate the arbitration award.

## II.   Discussion

### A.   Jurisdiction

The District Court had putative jurisdiction under 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1331, and we have jurisdiction to review final orders under, among other statutes, 28 U.S.C. § 1291.  But in this case we must assure ourselves of both finality and George's Article III standing, as the two are intertwined.  *See Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 269 (3d Cir. 2016).  Assuming the District Court's orders are final, we cannot avoid the question of standing as we did in *O'Hanlon v. Uber Technologies, Inc.*, an interlocutory appeal.  *See* 990 F.3d 757, 762–66, 766 n.4 (3d Cir. 2021).

---

[8] Although both *TransUnion* and *Kelly* had been decided by this point, the District Court again did not consider standing sua sponte.

9

We conclude that the May 2023 order declining to vacate the arbitration award is final for two reasons. First, the May 2023 order did exactly what is required for finality under § 1291: It "terminate[d] the litigation between the parties on the merits" and left nothing to do but "enforce by execution what has been determined." *Robinson v. Hartzell Propeller, Inc.*, 454 F.3d 163, 168 (3d Cir. 2006) (quotation marks omitted). Although it is true that the District Court neither confirmed the arbitration award nor entered judgment for Rushmore before terminating the case, an order can be final under § 1291 when it leaves nothing "for the district court to do but . . . confirm the arbitration award and enter judgment." *Alpine Glass, Inc. v. Ill. Farmers Ins. Co.*, 643 F.3d 659, 663–64 (8th Cir. 2011). That is the situation here.[9]

Second, even if the order declining to vacate were not final under § 1291, it would be final and appealable under 9 U.S.C. § 16(a)(3). That section allows for the appeal of a "final decision respecting . . . arbitration," and an order declining to vacate an arbitration award is one such "final decision." *Century Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 521 (3d Cir. 2009); *accord, e.g.*, *Selden v. Airbnb, Inc.*, 4 F.4th 148, 155 (D.C. Cir. 2021); *United States v. Park Place Assocs., Ltd.*, 563 F.3d 907, 919–20 (9th Cir. 2009). Even though § 16 does not contain an explicit grant of appellate jurisdiction, we have treated it as a jurisdiction-conferring

---

[9] To the extent Rushmore's ability to file a motion to confirm affected finality, it no longer does. Such a motion must be made "within one year after the award is made," and more than a year has passed since the arbitration award became final. 9 U.S.C. § 9; *see Aluminum Co. of Am. v. Beazer E., Inc.*, 124 F.3d 551, 557 (3d Cir. 1997).

10

provision in the past.  *See, e.g.*, *Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 268 (3d Cir. 2004).  This makes sense as a practical matter: Because many appealable orders listed in § 16(a)(1) are not covered by 28 U.S.C. § 1292, a contrary determination would render the language that an appeal "may be taken from" such orders without effect.  9 U.S.C. § 16(a).

The order declining to vacate the arbitration award is thus final, and the order compelling arbitration is final because "it [has] merged with [that] final order."  *Sapp v. Indus. Action Servs., LLC*, 75 F.4th 205, 210 (3d Cir. 2023); *see R & C Oilfield Servs. LLC v. Am. Wind Transp. Grp. LLC*, 45 F.4th 655, 659 (3d Cir. 2022).

Having ascertained that the relevant orders are final and appealable, we must next consider Article III standing, which "is essential to federal subject matter jurisdiction."  *Hartig Drug*, 836 F.3d at 269.  We turn to that question now, recognizing the "familiar" principle that we "always [have] jurisdiction to determine [our] own jurisdiction."  *United States v. Ruiz*, 536 U.S. 622, 628 (2002).

B.   <u>Standing</u>

Both George and Rushmore assert that George has, and had, standing.  That does not, however, end the inquiry: Standing is a "threshold jurisdictional requirement," and we have a "bedrock obligation to examine both [our] own subject matter jurisdiction" and that of the District Court.  *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997).  Our independent review reveals that, based on the amended complaint, George lacks standing under Article III and lacked standing below.

11

1.      Applicable Law

In order to show standing, a plaintiff bears the burden of establishing three distinct elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).  The first element is most relevant here, and three cases—*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), *Kelly*, 47 F.4th 202, and *Huber*, 84 F.4th 132—bear heavily on our analysis.  So we briefly recap those cases.

In *TransUnion*, the Supreme Court clarified that the "[c]entral" question when assessing concreteness is "whether the asserted harm has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms including . . . reputational harm." 141 S. Ct. at 2200 (quotation marks omitted).  Based on this

principle, the Supreme Court concluded that plaintiffs whose misleading credit reports "were disseminated to third-party businesses . . . suffered a concrete harm" qualifying as an injury in fact; these plaintiffs, the Court reasoned, had been subjected to "reputational harm associated with the [traditional] tort of defamation." *See id.* at 2208–09. Plaintiffs whose credit reports contained misleading information but were not disseminated, on the other hand, suffered no concrete harm and lacked standing to sue under the Fair Credit Reporting Act (FCRA). *See id.* at 2209–13.

In *Kelly*, we examined *TransUnion* in the context of "informational injury," the injury that occurs when "a plaintiff . . . fail[s] to receive information to which she is legally entitled." 47 F.4th at 211 (cleaned up). We first noted that informational injury can be "sufficiently concrete to confer standing," and that *TransUnion* did not disturb that basic premise. *See id.* at 211–13, 212 n.8. We then, in light of *TransUnion*, articulated what is required for informational injury: A plaintiff must show "(1) the omission of information to which [she] claim[s] entitlement, (2) adverse effects that flow from the omission, and (3) [a] nexus to the concrete interest Congress intended to protect" by requiring disclosure of the information. *Id.* at 214 (quotation marks omitted). We ultimately found informational injury because (1) the defendant did not disclose required source information, (2) as a result, both plaintiffs were denied apartments for which they applied, one plaintiff needlessly wasted his time and suffered confusion and distress, and one plaintiff could only secure public housing, and (3) the failure to disclose frustrated Congress's goal, under FCRA, of "empowering consumers to correct inaccurate information in their credit files." *Id.* at 214–15 (cleaned up).

13

In *Huber*, another case arising under the FDCPA, we distinguished *Kelly* and clarified that the informational-injury doctrine does not "extend . . . to the failure to disclose clearly and effectively." 84 F.4th at 146 (emphasis omitted). Because the plaintiff in *Huber* alleged an "unclear disclosure[]" rather than a "failure to disclose," we held that she did not suffer an informational injury and could not claim standing on that ground. *Id.* at 145–46. Nonetheless, we concluded that Huber had Article III standing "under traditional standing principles" because she suffered two financial consequences from the unclear disclosure: "one in consulting with her financial advisor . . . at her own additional cost, and the other in her failure to pay down her debts or otherwise take appropriate action beyond that consultation." *Id.* at 149 (quotation marks omitted). These "detrimental consequences," we wrote, were "sufficiently similar to the kind of harm protected by the tort of fraudulent misrepresentation"—the most "apt analogue" to Huber's FDCPA claim—"to establish . . . standing." *Id.* at 148–49.

As relevant here, *Huber* highlighted the importance of financial or other detrimental consequences to establishing traditional standing under the FDCPA. "[T]he harm traditionally recognized as providing a basis for fraudulent misrepresentation," we wrote, "is not the mere receipt of a misleading statement, or even confusion, without any further consequence." *Id.* at 148 (cleaned up). Instead, a claimant in Huber's shoes "must identify . . . a consequential action or inaction following receipt of a misleading or deceptive collection letter" to demonstrate injury in fact. *Id.* at 149 (quotation marks omitted). "[C]onfusion alone" is insufficient. *Id.* at 141.

2.        George's Standing

With those precepts in mind, we turn to George's case.[10] Her amended complaint asserts two different theories of harm: one, that George did not receive information to which she was legally entitled, and two, that the April 2018 letter was "false, deceptive, and misleading" in violation of the FDCPA.  App. 28.  Although the first sounds in informational injury and the second in traditional injury, George has not established standing under either theory.

a.        Informational Injury

As noted, a plaintiff asserting informational injury must show "(1) the omission of information to which [she] claim[s] entitlement, (2) adverse effects that flow from the omission, and (3) [a] nexus to the concrete interest Congress intended to protect" by requiring disclosure of the information.  *Kelly*, 47 F.4th at 214 (quotation marks omitted).  George has alleged

---

[10]   We take this opportunity to correct an apparent misapprehension.  In its briefing, Rushmore suggests George's admission during arbitration—that she never read the April 2018 letter—might somehow operate to retroactively deprive her of standing.  Not so.  We look to the amended complaint to assess standing at the outset, and for purposes of our analysis we accept as true the allegation that George "received and reviewed the . . . letter."  App. 28; *see, e.g.*, *N. Jersey Brain & Spine Ctr. v. Aetna, Inc.*, 801 F.3d 369, 371 (3d Cir. 2015).  Because we hold that George lacks (and lacked) standing based solely on the amended complaint, we need not determine whether and how her later admission affects the standing inquiry.

15

enough to get past prong one: Read fairly, her complaint indicates that Premier Bankcard was not, as required by 15 U.S.C. § 1692g(a)(2), "the creditor to whom the debt [was] owed."[11]  But her standing argument falters at prong two.

That is because the amended complaint does not allege specific adverse effects flowing from the omission; instead, it simply states that the April 2018 letter would have left "the least sophisticated consumer in doubt about to whom the alleged debt [was] owed and if it [was] legitimate."  App. 28. Nothing in the complaint indicates that George could not pay her debt as a result of the letter, that the omission caused downstream financial consequences, or that George suffered distress.[12]  *Cf. Kelly*, 47 F.4th at 214 (listing adverse effects). And even if confusion alone were sufficiently adverse to demonstrate informational injury, *but see Huber*, 84 F.4th at 148–49, the complaint does not even allege George herself was confused.  George's first theory of harm thus fails under our test in *Kelly*, and George has not shown an informational injury sufficient to confer Article III standing.

---

[11] We now know that Premier Bankcard was likely entitled to a share of George's debt, making it a creditor for FDCPA purposes.  *See* 15 U.S.C. § 1692a(4).  But we again accept as true, for purposes of our analysis, the allegation that Premier Bankcard was neither a current nor an original creditor.

[12] True, George alleges that her First Premier account was past due and in default.  But we cannot infer adverse effects from that allegation alone—doing so would vitiate the second prong of *Kelly*, since nearly every FDCPA claim involves an in-default or past-due account.  For the same reason, the filing of this lawsuit cannot constitute an adverse effect.

b.     <u>Traditional Injury</u>

George's second theory of harm fares no better. Under the "more traditional path prescribed by the Supreme Court in *TransUnion*," we must ask whether the injury alleged "has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Huber*, 84 F.4th at 146 (quotation marks omitted). As we clarified in *Huber*, a violation of 15 U.S.C. § 1692e is analogous to the tort of fraudulent misrepresentation,[13] and "the harm traditionally recognized as providing a basis for [a] fraudulent misrepresentation [suit] . . . is not the mere receipt of a misleading statement, or even confusion, without any further consequence." *Id.* at 148 (cleaned up). Yet "the mere receipt of a misleading statement" is all George has alleged: The amended complaint does not indicate George suffered confusion, let alone any sort of "cognizable harm . . . flow[ing] from that confusion." *Id.* at 148–49. Accordingly, George has not shown an injury in fact under *Huber* and *TransUnion*, and she lacks Article III standing under the "more traditional" approach in those cases. *Id.* at 146.

George attempts to evade this holding in *Huber* by arguing that "unreasonable debt collection," not fraudulent misrepresentation, is the most appropriate tort analogue for FDCPA claims. Opening Br. 4. Because unreasonable debt collection is an intentional tort that "gives rise to nominal and punitive damages without the need to allege any tangible harm

---

[13] George also alleges "unfair or unconscionable" practices in violation of 15 U.S.C. § 1692f, but that claim is entirely dependent on her § 1692e claim and rests on the same theory of harm.

17

or actual damages," George says, the "harm traditionally recognized as providing a basis for [an unreasonable-debt-collection] lawsuit in American courts" is essentially the fact of the occurrence. *Id.* at 6 (emphasis omitted); *TransUnion*, 141 S. Ct. at 2200. Thus, in George's view, the injury she has alleged—receipt of a misleading letter—is sufficiently concrete to constitute injury in fact.

Even assuming, arguendo, that unreasonable debt collection is an "apt analogue" for a violation of § 1692e, George's argument lacks merit.[14] *Huber*, 84 F.4th at 148. As far as we can tell, the freestanding tort of unreasonable debt collection first appeared in the 1950s and is recognized only in one jurisdiction—Texas. Boe W. Martin, *A Creditor's Liability for Unreasonable Collection Efforts: The Evolution of a Tort in Texas*, 9 S. Tex. L.J. 127, 130–32 (1966); *see also, e.g.*, *Church v. Collection Bureau of Hudson Valley, Inc.*, No. 20-cv-03172, 2023 WL 8185669, at *7–8 (D.N.J. Nov. 27, 2023). We cannot say, based on this fact, that the harm associated with unreasonable debt collection was "*traditionally* recognized as providing a basis for a lawsuit in *American* courts."[15] *TransUnion*, 141 S. Ct. at 2200 (emphasis

---

[14] The law firm representing George has repeatedly tried to argue traditional standing based on the tort of unreasonable debt collection, and courts have repeatedly rejected those efforts. *See, e.g.*, *Chang v. Frontline Asset Strategies, LLC*, No. 18-cv-02388, 2024 WL 1209184, at *3–5 (D.N.J. Mar. 21, 2024); *Church v. Collection Bureau of Hudson Valley, Inc.*, No. 20-cv-03172, 2023 WL 8185669, at *4–15 (D.N.J. Nov. 27, 2023). We do the same here.

[15] The sources cited by George are not to the contrary. George states that "there are many reported decisions from the

added).  And in any event, one element of the tort seems to be that "the unreasonable collection efforts were a proximate cause of physical illness and mental and emotional pain." *See Church*, 2023 WL 8185669, at *5 (cleaned up) (citing Texas cases).  The harm associated with unreasonable debt collection would thus be "physical illness and mental and emotional pain," *id.* (quotation marks omitted), not just the receipt of a misleading letter.  George has not come close to alleging that harm.

\* \* \*

In sum, because George's amended complaint alleges neither an informational injury nor a traditional one, George lacks standing before us and lacked standing before the District Court.  *See Lutter v. JNESO*, 86 F.4th 111, 124 (3d Cir. 2023) ("[T]he general rule is that a plaintiff in federal court must have Article III standing on the date the lawsuit was commenced.").  We proceed to consider how this lack of standing affects the District Court's orders compelling arbitration and denying vacatur.

---

nineteenth and twentieth centuries" classifying unreasonable debt collection as a separate tort.  Opening Br. 4.  But the article she cites in support of that proposition discusses intentional infliction of emotional distress as related to debt collection, not unreasonable debt collection itself.  *See* Calvert Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv. L. Rev. 1033, 1063–64 (1936).  The same is true of the Restatement illustrations George flags.  *See* Restatement (Second) of Torts § 46 illus. 7–8 (Am. L. Inst. 1965).

19

### C.    The District Court's Orders

The FAA is "something of an anomaly in the field of federal-court jurisdiction," in that it "bestow[s] no federal jurisdiction but rather require[s] an independent jurisdictional basis." *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581–82 (2008) (quotation marks omitted).  For a federal court to have jurisdiction over a motion to compel arbitration, it must be that the "entire . . . controversy between the parties . . . could be litigated in federal court" without the arbitration agreement. *Vaden v. Discover Bank*, 556 U.S. 49, 66 (2009) (quotation marks omitted); *see* 9 U.S.C. § 4.  We must, in other words, "look through" a motion to compel and find a jurisdictional basis for the underlying suit. *Vaden*, 556 U.S. at 66.  And a motion to vacate must identify a "grant of jurisdiction, apart from [the FAA] itself, conferring access" to a federal forum; there is no look-through approach for such a motion. *Badgerow v. Walters*, 142 S. Ct. 1310, 1315–18 (2022) (quotation marks omitted); *see* 9 U.S.C. § 10.[16]

Here, because George lacked standing at the outset of her suit, the District Court could not properly exercise jurisdiction under 15 U.S.C. § 1692k(d) or 28 U.S.C. § 1331. *See Hartig Drug*, 836 F.3d at 269.  And because the District Court could not properly exercise jurisdiction under either statute, it lacked jurisdiction over the "controversy between the

---

[16] Of course, if a district court has an independent jurisdictional basis, such as 28 U.S.C. § 1331, to hear a suit, that court's jurisdiction "continues over" both a motion to compel and a subsequent motion to vacate. *See, e.g.*, *Kinsella v. Baker Hughes Oilfield Operations, LLC*, 66 F.4th 1099, 1103 (7th Cir. 2023).

parties" and the motion to compel.[17]  *See Vaden*, 556 U.S. at 66 (quotation marks omitted).  Similarly, because (1) the District Court lacked jurisdiction over the suit, and (2) George's motion to vacate identifies no "grant of jurisdiction" beyond the FAA, the District Court had no jurisdiction to consider that motion.[18]  *Badgerow*, 142 S. Ct. at 1316.

A lack of jurisdiction "voids any decree entered in a federal court," and the District Court's orders granting Rushmore's motion to compel and denying George's motion to vacate are void.[19]  *Steel Valley Auth. v. Union Switch &*

---

[17] In a recent case similar to the one before us, the Fifth Circuit wrote that "any of the reasons . . . a federal court may lack subject matter jurisdiction over the underlying dispute—*e.g.*, ripeness—would similarly prevent a district court from having jurisdiction to compel arbitration" under *Vaden*.  *Lower Colo. River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 923 (5th Cir. 2017); *see id.* at 926–27.  We agree, and we recognize Article III standing as one of those reasons.

[18] The motion references the FDCPA, § 1692e, and the "least sophisticated debtor" standard.  *See Brown v. Card Serv. Ctr.*, 464 F.3d 450, 453–54 (3d Cir. 2006).  But these references cannot constitute an "independent jurisdictional basis" for a motion to vacate.  *Badgerow*, 142 S. Ct. at 1316.  To hold otherwise—to allow federal jurisdiction over a motion to vacate whenever the underlying dispute involves federal claims—would be to embrace the exact look-through approach *Badgerow* rejected.  *See id.* at 1317–18.

[19] We asked the parties to address whether the orders might be erroneous, rather than void, under the logic of *Marshall v. Board of Education*, 575 F.2d 417 (3d Cir. 1978).  In *Marshall*,

*Signal Div.*, 809 F.2d 1006, 1010 (3d Cir. 1987); *see also, e.g.*, *Lower Colo. River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 926–27 (5th Cir. 2017).  We will accordingly vacate those orders.

### D.   The Arbitration Award

There is one loose end to tie up before concluding, and that is the arbitration award.  What becomes, or should become, of an arbitration award stemming from a void order like the one

---

we held that "a judgment is not void" under Federal Rule of Civil Procedure 60(b)(4) "simply because it is erroneous, or is based upon precedent which is later deemed incorrect or unconstitutional."  *Id.* at 422.  "A court has the power to determine its own jurisdiction," we wrote, and "[i]n the interest of finality . . . an error in that determination will not render the judgment void" absent a "clear usurpation of power."  *Id.* at 422 n.19 (quotation marks omitted).

It is tempting to analogize to Rule 60(b)(4) in this case.  The arbitration award resembles a final judgment, and the high standard for setting aside a final judgment is similar to the high standard for setting aside an arbitration award.  *See* App. 112 (noting that the arbitrator's decision "will be final and binding" on the parties); *compare Marshall*, 575 F.2d at 422 & n.19, *with Whitehead v. Pullman Grp., LLC*, 811 F.3d 116, 119–21 (3d Cir. 2016).  But *Marshall*, by its terms, applies only to collateral challenges, and the opinion clarifies that erroneous jurisdictional determinations can still be held void on direct review.  575 F.2d at 422–23, 422 n.19.  *Marshall* is therefore distinguishable, and we decline to extend its logic to this direct appeal.

22

at issue here?  George suggests that, because the order compelling arbitration is void, we must also vacate the arbitration award.  Rushmore, meanwhile, would have us invoke various equitable doctrines to preserve the award for future enforcement.  It suggests, for example, that "George is estopped from . . . arguing that the arbitration award against her is a nullity" because, as between the District Court's two options, she elected to initiate arbitration proceedings. Rushmore First Suppl. Br. 5.  It also suggests that *Caterpillar Inc. v. Lewis*, 519 U.S. 61 (1996), requires enforcement of the award, and that the arbitrator "was legally empowered to enter the arbitration award . . . regardless of George's Article III standing," Rushmore First Suppl. Br. 5.

Having considered the parties' positions, we decline to endorse either.  George lacks standing on appeal, and "when [jurisdiction] ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quotation marks omitted).  In addition, we note that section 10 of the FAA lists the "exclusive grounds" for vacating an arbitration award, and "where the award stemmed from a void order" is not plainly listed in that section.  *Mattel*, 552 U.S. at 584; *see* 9 U.S.C. § 10.

We therefore do not reach the question of whether the arbitration award remains valid and enforceable (under the AAA rules, because George assented to the arbitrator's jurisdiction, or otherwise) or whether it should be vacated in a "jurisdictionally correct proceeding." *Brown*, 75 F.3d at 868. The answer to that question lies with a court of competent jurisdiction—presumably a New Jersey state court or an AAA tribunal.

23

To close, we offer a few words on the equities in this case. We recognize that our holding may ultimately clear the way for a redo of George's lawsuit—a frustrating result for Rushmore given that "the parties have already fully [litigated and] arbitrated the underlying dispute once." *Papalote Creek*, 858 F.3d at 927. And we recognize this result may be particularly frustrating given its origin in cases decided after the motion to compel. *See supra* notes 5, 8. But that is the importance of Article III standing, and "we cannot evade the fact that the district court lacked jurisdiction when it compelled arbitration" and ruled on George's motion to vacate.[20] *Papalote Creek*, 858 F.3d at 927.

## III.    Conclusion

For the foregoing reasons, we will vacate the District Court's orders and remand with instructions to dismiss this case for lack of standing.[21]

---

[20] We do not foreclose the possibility that, in a case where gamesmanship is apparent—a case, perhaps, where a plaintiff deliberately submits an on-the-fence complaint and later argues she lacks standing in order to void an arbitration order—equitable considerations could compel a different result. Here, however, both parties assert that George has standing, and we do not doubt the parties have operated in good faith.

[21] While in some circumstances we might remand with instructions to grant leave to amend, here we find amendment would be futile given George's testimony that she never read the April 2018 letter. *See Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 292 (3d Cir. 1988).